**Alston R. KEENER, Plaintiff–Appellant,**

**v.**

**EXXON COMPANY, USA, a foreign corporation; Exxon Corporation, a foreign corporation, Defendants–Appellees,**

**and**

**Alan Enterprizes, a West Virginia Limited Liability Company; Joe DeFazio Oil Company, a West Virginia Corporation; Joseph A. DeFazio, individually and as organizing partner number one of Alan Enterprizes, a West Virginia Limited Liability Company; Joseph DeFazio, individually and as organizing partner number two of Alan Enterprizes, a West Virginia Limited Liability Company, Defendants.**

**No. 94–1142.**

United States Court of Appeals, Fourth Circuit.

Argued June 6, 1994.

Decided Aug. 15, 1994.

**ARGUED:** Thomas Matthew Wilson, III, Tydings & Rosenberg, Baltimore, MD, for appellant. Gaspare Joseph Bono, Howrey & Simon, Washington, DC, for appellees. **ON BRIEF:** Lynn A. Kohen, Tydings & Rosenberg, Baltimore, MD, Paul Cranston, Morgantown, WV, for appellant. Robert G. Abrams, Robert E. Leidenheimer, Jr., Howrey & Simon, Washington, DC, for appellees.

Before MURNAGHAN, WILKINSON, and WILKINS, Circuit Judges.

Affirmed by published opinion. Judge WILKINSON wrote the majority opinion, in which Judge WILKINS joined. Judge MURNAGHAN wrote a dissenting opinion.

### OPINION

WILKINSON, Circuit Judge:

The question in this case is whether a gasoline station franchisee had an opportunity to exercise a valid right of first refusal as established by the Petroleum Marketing Practices Act ("PMPA"). *See* 15 U.S.C. §§ 2801–2806. Under the Act, a franchisor desiring to sell a station operated by a franchisee must either make a bona fide offer of sale to the franchisee or give the franchisee an opportunity to buy the station on the same terms as a third party offer. *See* 15 U.S.C. § 2802(b)(3)(D)(iii). Here, the franchisor pursued the second route and offered

the franchisee the station at the same price bid by a third party. This fact creates a strong presumption that a valid right of first refusal was extended. Because plaintiff's evidence is insufficient to overcome that presumption, we affirm the district court's decision that the franchisor complied with the PMPA's right of first refusal provision.

## I.

In 1984, Exxon began construction of a service station in Morgantown, West Virginia. After the station was completed, it was leased to Alston Keener as Exxon's dealer-franchisee. Under the agreement with Exxon, Keener paid monthly rent and the costs of the gasoline he purchased from Exxon. The franchise was a profitable one, and the two parties signed a lease renewal in November 1988. The new lease was scheduled to run until March 1, 1992.

In 1991, Exxon began considering ways to improve the efficiency of its gasoline supply system. As part of that plan, Exxon decided it would phase out the use of dealer-operated stations in certain markets and sell those station sites to Exxon's independent distributors.[1] One of the markets selected for the new system included the Morgantown area. Exxon determined that part of the new strategy required sale of the station leased by Keener. It thus notified Keener on September 26, 1991 that his lease would not be renewed.

Exxon, following the procedures it had established for the sale of stations, solicited bids for the purchase of Keener's station from six Exxon-brand distributors in the region. The solicitations informed bidders that the minimum acceptable price was $547,000 and that Exxon would require an option to repurchase the station if the site ceased selling Exxon-brand gasoline at any time over the next twenty-one years. Three distributors ultimately bid on the station, with the high bid of $1,200,010 coming from Joe DeFazio Oil Company. Keener was notified of this bid on December 17, 1991, and offered a right of first refusal pursuant to 15 U.S.C.

§ 2802(b)(3)(D)(iii)(II). Exxon explained that Keener would have sixty days to purchase the station at the same price as DeFazio had bid. Exxon also told Keener that he would not be required to provide Exxon with the option agreement.

Keener then began negotiations with several other Exxon distributors in the area to determine whether they would provide him with Exxon products should he decide to purchase the station. Both Clements Oil Company and Hess Oil Company offered to sell Keener Exxon gasoline. However, Keener did not choose to match DeFazio's price. Instead, Keener asked Exxon to sell him the station at its "fair market value." Exxon declined, and sold the station premises to DeFazio.

Keener subsequently filed suit in West Virginia state court. The suit was removed to federal district court in West Virginia and then transferred with the parties' consent to federal district court in Maryland. Keener contended that the right of first refusal contained in 15 U.S.C. § 2802(b)(3)(D)(iii)(II) of the PMPA meant that he was entitled to buy the same thing DeFazio Oil bid on at the same price DeFazio Oil offered. Exxon had not honored that entitlement, he claimed, because DeFazio Oil had bid on the station with the extra advantage of Exxon's promise to provide DeFazio Oil with a supply of gasoline. Because he was not actually being offered the same thing DeFazio Oil had bid on, Keener claimed, Exxon's actions violated the PMPA. Keener therefore requested that the court either (1) order DeFazio Oil to transfer the station to Keener for the asserted "fair market value" of $547,000, or (2) find Exxon liable for $653,010, the difference between $547,000 and the price DeFazio paid.

The district court rejected Keener's argument and granted summary judgment for Exxon. Contrary to Keener's claim, the district court found that he had, in fact, been offered the opportunity to purchase Exxon's interest in the property on the same terms as DeFazio. Indeed, the court concluded that

---

1. Before the new policy, stations such as Keener's were apparently supplied either by an independent Exxon-brand distributor that purchased gasoline from Exxon and delivered it to the station site, or on a directservice basis by Exxon itself.

because Keener did not have to provide Exxon with the repurchase option, "[t]he deal offered to Keener was thus more advantageous" than that offered to other bidders. The district court also noted that Keener could have continued to operate the premises as an Exxon station if he had matched the DeFazio Oil offer and then bought gasoline from an Exxon distributor. Once Keener declined to exercise his right to match the DeFazio Oil bid, the district court concluded, Exxon acted appropriately under the PMPA in selling the station to DeFazio.

Keener now appeals.

## II.

The PMPA itself contains no statement of legislative purpose, but the background of its passage has left that purpose clear. There was much concern expressed that franchisors had used the threat of franchise termination to impose harsh conditions upon the business operations of franchisees. *See* S.Rep. No. 95–731, 95th Cong., 2d Sess. 17–19 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 875–77. The Act did not create absolute protection for franchisees, however; it established only "minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the franchisor or supplier of such fuel." 1978 U.S.C.C.A.N. at 873; *see Tobias v. Shell Oil Co.*, 782 F.2d 1172, 1174 (4th Cir.1986).

The establishment of only minimal standards was motivated in part by the desire to limit federal intrusion into the property rights of the franchisor. *See Valentine v. Mobil Oil Corp.*, 789 F.2d 1388, 1391 (9th Cir.1986). Similarly, the Act intended to preserve the "flexibility" of petroleum delivery markets. 1978 U.S.C.C.A.N. at 877; *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 486–87 (3d Cir.1987); *Radecki v. Amoco Oil Co.*, 634 F.Supp. 1393, 1401 (D. Minn.1986). Congress understood that an industry driven by national and international market forces faces rapidly changing conditions. Such

market uncertainties underscored the need for the petroleum industry to retain maximum economic efficiency in all areas, including the delivery of gasoline to individual consumers. *See* 1978 U.S.C.C.A.N. at 877 (noting the importance of preserving franchisor ability to respond to "changing market conditions"); *see also May–Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 921 (6th Cir.1989).

The PMPA preserves the flexibility of petroleum delivery markets by ensuring that sound business judgment does not become a casualty of constant judicial oversight. *See Valentine*, 789 F.2d at 1392 n. 7. Section 2802(b)(3)(D)(iii), the provision at issue here, demonstrates the point. Once a franchisor makes the determination not to renew a franchise and sell the franchise station, the franchisor has two options. It may either make the franchisee a "bona fide offer to sell" the station, or it may provide the franchisee with a "right of first refusal" at a price offered by a third party buyer.[2] Providing the franchisor this choice demonstrates the statute's flexibility; more importantly, both options included in § 2802(b)(3)(D)(iii) fully reserve the price determining function to market actors.

## III.

In the case before us, Exxon made a business judgment that its distributors were in the best position to efficiently deliver company products to the consumer, and the value of the station was determined by competitive bidding among those distributors. Keener, of course, did not disappear from the picture: once DeFazio extended the $1,200,010 bid, Exxon gave Keener the opportunity to purchase the station at that price. *See* 15 U.S.C. § 2802(b)(3)(D)(iii)(II). Instead of exercising this right of first refusal, Keener chose to challenge the propriety of Exxon's actions through litigation.

---

**2.** Specifically, the franchisor must have either:

(I) made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or

(II) if applicable, offered the franchisee a right of first refusal of at least 45–days duration of an offer, made by another, to purchase such franchisor's interest in such premises. 15 U.S.C. § 2802(b)(3)(D)(iii).

Keener's challenge rests on the assertion that the property Exxon offered him somehow differed from what DeFazio Oil had offered to buy. The fact that Exxon offered Keener the service station at the same price DeFazio Oil had bid, however, creates the strong presumption that Exxon fulfilled its right of first refusal obligation under § 2802(b)(3)(D)(iii)(II). This presumption that a same price offer evidences statutory compliance reflects the recognition that claims such as Keener's intrude upon normal business operations once filed. Indeed, Keener's suit, by calling into question DeFazio Oil's continued operation of the station, can only have made it more difficult for DeFazio to manage its business affairs. Such a result, of course, is disruptive of the market efficiency the PMPA sought to maintain. Accordingly, early resolution of claims is of special significance in the PMPA context, and a presumption of statutory compliance where Exxon offered the same station for the same price facilitates that end. The presumption also comports with the desire not to transform a simple statutory requirement into a complex and cumbersome one necessitating a detailed economic analysis of private sector decisions. *See Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 377 (4th Cir.1992) (per curiam). It remains only to determine whether Keener has made a sufficient showing to create a triable issue of fact in the face of that presumption.[3]

## IV.

### A.

Keener asserts that Exxon sold DeFazio Oil both a gasoline supply commitment and the station proper, whereas Exxon offered him only the opportunity to buy the station. This position finds only minimal support in the record. There is, of course, evidence that Exxon planned to, and ultimately did, increase the gasoline supply to the distributor who purchased the station. This evidence does not mean, however, that the purchase of the station entitled DeFazio Oil to the increased allotment. DeFazio Oil still had to apply separately for the increased allotment to supply the station.[4] If its distributorship were terminated, its right to purchase gasoline from Exxon for the station would end. In this respect, DeFazio's position bore a substantial similarity to that of Keener. Keener had every opportunity to assure a similar allotment of Exxon gasoline for himself by signing a contract with one of two Exxon distributors that offered to supply him if he purchased the station. Whatever points Keener wishes to make with respect to DeFazio's relationship with Exxon are thus significantly blunted by his own ability to secure supplies of Exxon gasoline.

Keener's real complaint is that DeFazio Oil had some sort of unfair advantage in the bargaining process by being able to deal directly with Exxon. Whatever advantage DeFazio Oil may have had, however, resulted from its preexisting distributor relationship with Exxon, not from the contract for sale of the station. Because DeFazio Oil already routinely purchased and distributed Exxon gasoline in the region, it was a relatively simple matter for the company to expand its existing distribution contract requirements with Exxon to accommodate the increased

---

**3.** The dissenting opinion argues that the foregoing presumption is one that is created out of "whole cloth," and one that bears no relation to the purposes of the statute. To the contrary, the presumption is directly tied to the statutory requirement that a right of first refusal be extended. As a matter of basic logic, a valid right of first refusal would seem presumptively extended when the same property is offered the franchisee at the identical price bid by a third party. Moreover, a presumption is often necessary to afford guidance to district courts in the course of the summary judgment process and to prevent a straightforward statutory requirement from becoming a litigious quagmire. Courts have routinely structured statutory proof schemes through the mechanism of presumptions. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The dissent's approach, by contrast, would leave litigants and district courts at sea.

**4.** Keener contends that this point is irrelevant because the DeFazio Oil bid was not finalized into an actual sale until after the increased allotment had been approved. This contention still provides no indication that the station sales contract in itself guaranteed DeFazio Oil a supply of Exxon gasoline.

gasoline supply it would need to operate the station. Such advantages are in no sense impermissible; the PMPA does not prohibit the sale of stations to distributors, and federal courts are not in the business of equalizing all advantages on the market's playing field. It also should not be forgotten that DeFazio's position as a distributor caused him some harm as well. It is undisputed that Keener did not have to provide Exxon with the repurchase option that all the distributors bidding on the station were required to accept. As a result, Keener had the advantage of being offered the station unencumbered by any contractual restrictions. The point here is that bidders routinely come to the table with different hands, and Keener can make no claim based on the fact that DeFazio Oil's preexisting commercial relationships gave it certain advantages in setting up an Exxon franchise at the station site.

### B.

Keener also argues that the price DeFazio Oil paid demonstrates that more than just the station was at stake. He notes that Exxon initially appraised the station at $370,000 and ultimately approved a minimum sale price of $547,000. From these facts, Keener concludes that $547,000 is the value of the station alone, and argues that the discrepancy between this figure and the $1,200,010 DeFazio Oil paid can only be explained by the fact that DeFazio also purchased a guaranteed supply of Exxon gasoline.

This position suffers from several infirmities. To begin with, Keener downplays the fact $547,000 was simply the minimum acceptable price Exxon set for the station. This price thus represents nothing more than a floor on the bidding process. It is not necessarily Exxon's valuation of what it believed the station was likely to bring on the market.

More importantly, Keener's position reflects the belief that fair market value can most accurately be calculated in the abstract. However, fair market value is, by necessity, best set by the market itself. An actual price, agreed to by a willing buyer and a willing seller, is the most accurate gauge of the value the market places on a good. Until such an exchange occurs, the market value of an item is necessarily speculative. *See Amerada Hess Corp. v. Commissioner of Internal Revenue,* 517 F.2d 75, 83 (3d Cir.1975). Here, the only such agreed upon price was the $1,200,010 bid that DeFazio Oil made. That price is a measure of what the station was worth to a distributor in DeFazio's position.[5] The fact that a final bid turns out to be higher than the level at which the bidding opens is not just endemic to the bidding process, but the commercially reasonable hope of every offeror. As a PMPA offeror, Exxon was entitled to seek the best purchase price that it could find for its property. The fact that it received such a price does nothing to strengthen plaintiff's case.

### V.

Keener's assertions thus fail to raise a triable question as to whether Exxon has complied with the PMPA's right of first refusal provision. This conclusion is strengthened by the fact that Keener has never sought a form of relief consonant with his stated injury. He has never offered to match DeFazio's bid. Instead, Keener has sought a court order mandating the transfer of the station to him for the $547,000 price floor set by Exxon, or damages based on the difference between the $547,000 price and the price DeFazio bid. Both these remedies would allow Keener to capture an unacceptable windfall based on an erroneous fair market valuation. *See Ballis v. Mobil Oil Corp.,* 622 F.Supp. 473, 476 (N.D. Ill.1985). We cannot accept the view that the protection of franchisees under the PMPA requires any

---

**5.** Because of its distributorship, DeFazio was able to purchase gasoline at the "rack" price. This price advantage most likely made it possible for DeFazio to bid a higher amount and still turn a profit operating what all admit was a high volume station. The $1,200,010 payment may, therefore, be termed the fair market value of the station. Indeed, when a third party makes an offer in cash, or its equivalent, for an item, a "court can justifiably infer that the amount of an arms' length offer represents the value of the station." *Ellis v. Mobil Oil,* 969 F.2d 784, 786 (9th Cir.1992).

such bonanza, particularly where the franchisor has done nothing more than get the best value it could for its property.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

MURNAGHAN, Circuit Judge, dissenting.

The sole issue on appeal is whether the terms of Exxon's offer to Keener were identical to the terms of DeFazio Oil's offer to Exxon. *See Razavi v. Amoco Oil Co.*, 833 F.Supp. 1, 8 (D.D.C.1993) (stating that the "right of first refusal" provision of the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2802(b)(3)(D)(iii)(II), obliges a franchisor to offer to sell its gasoline station to the franchisee "on terms *identical* to those the [franchisor] has received from another" (emphasis added)); *Ellis v. Mobil Oil Corp.*, 708 F.Supp. 1094, 1096 (D. Ariz.1989) (same), *aff'd in relevant part*, 969 F.2d 784 (9th Cir.1992); *see also Atlantic Ave. Oil & Gas Ltd. v. Texaco Ref. & Mktg., Inc.*, 699 F.Supp. 27, 31 (E.D.N.Y.1988) ("A right of first refusal is a right to buy *on the same terms* offered by a third party." (emphasis added)), *aff'd*, 870 F.2d 93 (2d Cir.1989).

On appeal from the entry of summary judgment, we must construe the terms of the offers by viewing all of the record evidence, and all reasonable inferences that may be drawn therefrom, in the light most favorable to Keener, the party opposing summary judgment. *See Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). As the franchisor, Exxon bears the burden of going forward with evidence to establish that the terms of the two offers were identical. *See* 15 U.S.C. § 2805(c).

Under the terms of DeFazio Oil's offer to Exxon, DeFazio Oil gave Exxon (1) $1.2 million, and (2) an option to repurchase the service station if it ceased to be used to sell Exxon-brand motor fuel at any time in the next twenty-one years. Exxon gave DeFazio Oil (1) the station, (2) the right to display Exxon's trademark at the station, and (3) the right to purchase a sufficient supply of Exxon-brand motor fuel, at the relatively low "rack" price, to meet the station's needs (*i.e.*,

approximately 1.7 million gallons of fuel per year).

The terms of Exxon's offer to Keener were much simpler: Keener would have to have given Exxon $1.2 million and Exxon would had to have given Keener the station. Clearly, the express terms of the two offers were *not* identical. As an example, the promise of a sufficient supply of Exxon-brand motor fuel at the "rack" price was not to be given.

Furthermore, Exxon has pointed to nothing in the record to suggest that the value of the repurchase option equalled the sum of the values of the trademark agreement and the gasoline supply commitment. Indeed, there is evidence to the contrary. Purchasing from an Exxon distributor (who would himself first purchase at the "rack" price) instead of from Exxon itself is obviously less advantageous since some additional profit would be due to the distributor. Thus, the Court has no basis for holding that the two offers were equivalent, either in their express language *or* in their economic worth. Therefore, I would vacate the grant of summary judgment and remand the case to the district court.

The majority avoids that result by creating out of whole cloth a "strong presumption" that, whenever two offers contain the same purchase price, a valid right of first refusal has been extended—regardless of whether the same items were being purchased at that price. The majority's "strong presumption" finds no support in the plain language of the PMPA or in the case law interpreting that statute. Furthermore, it makes no sense to presume that an offer to buy several valuable property interests (*e.g.*, a station plus the right to use a trademark plus the right to distribute a supply of fuel) and an offer to buy only one of those interests (*e.g.*, a station) are "identical" merely because the dollar amounts contained in the bids are the same. Moreover, the majority's creation of the "strong presumption" could undermine the very purpose of the PMPA—to protect relatively weak local franchisees from the unfair business practices of powerful and sophisticated oil companies. *See Barnes v. Gulf Oil Corp.*, 824 F.2d 300, 306 (4th Cir. 1987) ("[The PMPA] was *designed* to benefit

the small retailer ...." (emphasis in the original)); *id.* at 305 ("As remedial legislation, the [PMPA] must be given a liberal construction consistent with its goal of protecting franchisees." (citation and internal quotation marks omitted)).* Therefore, I respectfully dissent.

**UNITED STATES of America,**
**Plaintiff–Appellant,**

**v.**

**Willie MACKINS, Defendant–Appellee.**

**No. 94–5019.**

United States Court of Appeals,
Fourth Circuit.

Argued June 10, 1994.

Decided Aug. 17, 1994.

---

* I recognize that the hard task of interpreting statutes can, in some cases, be aided by the application of judicially-created presumptions. *See generally* J. Harvie Wilkinson III, *Toward a Jurisprudence of Presumptions*, 67 N.Y.U. L.Rev. 907 (1992). In my view, however, this is not a proper case in which to apply such a presumption.

**ARGUED:** Thomas Ernest Booth, U.S. Dept. of Justice, Washington, DC, for appellant. Jesse James Waldon, Jr., Charlotte, NC, for appellee. **ON BRIEF:** Jerry W. Miller, U.S. Atty., Kenneth D. Bell, Asst. U.S. Atty., U.S. Dept. of Justice, Washington, DC, for appellant.

Before MURNAGHAN, WILKINS, and WILLIAMS, Circuit Judges.

Reversed by published opinion. Judge MURNAGHAN wrote the opinion, in which Judge WILKINS and Judge WILLIAMS joined.

## OPINION

MURNAGHAN, Circuit Judge:

A federal grand jury sitting in the Western District of North Carolina indicted Willie Mackins, appellee, for conspiracy to traffic in heroin and cocaine (Count 1), in violation of 21 U.S.C. § 846; possession with intent to distribute heroin on August 15, 1991 (Count 2); and possession with intent to distribute heroin and cocaine on August 16, 1991 (Count 3), both in violation of 21 U.S.C. § 841(a)(1). At appellee's trial, the jury acquitted him on Counts 1 and 2, but deadlocked on Count 3. The district court entered a judgment of acquittal on Count 3.

### I

The government has appealed, claiming that the district court erred in its judgment of acquittal, and that the appellee can therefore be tried again on Count 3 without violating his right to be free from double jeopardy.

#### A. *The Offense Conduct.*

1. *The Conspiracy (Count 1).* Count I alleged that between January 1989 and December 1991, appellee conspired with Mi-chael Blakely and others to traffic in heroin and cocaine in Charlotte, North Carolina. The government's evidence showed that appellee, a bail bondsman, regularly sold Blakely cocaine in kilogram quantities for resale. Some of appellee's sales took place at appellee's residence. Blakely also purchased cocaine for resale from Robert Mack, appellee's brother-in-law. In 1990, on several occasions, appellee sold heroin in ounce quantities to Blakely. Mack also sold heroin to Blakely. In 1992, appellee sold two kilograms of cocaine to Larry Davis for $40,000.

2. *Possession with Intent to Distribute Heroin (Count 2).* Count 2 alleged that on August 15, 1991, appellee possessed heroin with intent to distribute it. The government's evidence showed that in the fall of 1991, law enforcement agents learned that Mack, who had recently been arrested for drug trafficking, had stored some drugs at his residence. On August 15, FBI Agent Erik Blowers, Charlotte Police Department Officer Tom Hazleton, and other agents went to Mack's residence to seize the drugs. Mrs. Mack, appellee's sister, told the agents that she had previously received a package for Robert Mack shortly after his arrest, and that she had given the package to appellee, who lived across the street.

Later that day, the agents met appellee at his home. The agents told appellee that they suspected that he was holding drugs for Mack. Appellee stated that he had been holding a package containing an unknown substance for Mack in his car for several months. The agents searched appellee's car, opened the package, and found about 400 grams of heroin inside. Appellee denied knowing that the substance in the package was heroin. The agents seized the heroin, gave appellee a receipt, and returned to their office.

3. *Possession with Intent to Distribute Heroin (Count 3).* Count 3 alleged that on August 16, 1991, appellee possessed heroin and cocaine with intent to distribute them. On August 15, 1991, after the agents returned to their office, they were told by an informant that appellee had additional heroin in his home. On August 16, the agents met

appellee at his home and told him of their suspicions. Appellee denied having any drugs, and consented to a search of his residence. Appellee told the agents that he had stored some of Mack's personal property in two buildings behind his residence. Inside a garage, appellee withdrew a military ammunition box from behind an exposed beam near the back of the garage and told the agents that it belonged to Mack. Appellee opened the box, which contained approximately 100 grams of heroin, 375 grams of cocaine, baggies, and a razor blade. The agents seized the box and the contraband. Officer Hazleton testified that drugs seized from appellee's car and garage were worth about $1,000,000.

The agents summoned a drug detecting dog team to search appellee's home. Appellee told the agents that he had "a good idea of what was in the box" and that he kept the box in the building because he "ain't going to keep that stuff in my house."

### B.  *The Trial Proceedings.*

The government's case against appellee on the conspiracy count consisted of the testimony of appellee's former alleged coconspirators, including Blakely and Davis. The gov-

ernment's case against appellee on the substantive drug counts (Counts 2 and 3) consisted of the testimony of FBI Agent Blowers and Officer Hazleton. At the end of the government's case, appellee moved for a judgment of acquittal, but the district court denied the motion.

Appellee testified that he did not participate in the charged drug conspiracy and that he did not know that there was heroin in his car or drugs in the ammunition box. Appellee explained that he had merely stored some of Mack's personal property for Mack while he was in jail and that he was unaware of the contents of that property. After the defense presented its case, appellee renewed his motion for a judgment of acquittal, but the court denied the motion.

On December 3, 1993, the jury acquitted appellee on Counts 1 and 2, but deadlocked on Count 3. The district court declared a mistrial on Count 3 because of the jury deadlock. At the urging of the district court, appellee moved to dismiss the indictment. The district court stated that Fed.R.Crim. Proc. 29 [1] authorized it to enter a directed verdict of not guilty when a jury has failed to reach a verdict, and it was "grant[ing] the

---

1.  Fed.R.Crim.Proc. 29 reads:

**Rule 29.  Motion for Judgment of Acquittal**

**(a) Motion Before Submission to Jury.** Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the government is not granted, the defendant may offer evidence without having reserved the right.

**(b) Reservation of Decision on Motion.** If a motion for judgment of acquittal is made at the close of all the evidence, the court may reserve decision on the motion, submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.

**(c) Motion After Discharge of Jury.** If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed

within 7 days after the jury is discharged or within such further time as the court may fix during the 7–day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal. If no verdict is returned the court may enter judgment of acquittal. It shall not be necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury.

**(d) Same: Conditional Ruling on Grant of Motion.** If a motion for judgment of acquittal after verdict of guilty under this Rule is granted, the court shall also determine whether any motion for a new trial should be granted if the judgment of acquittal is thereafter vacated or reversed, specifying the grounds for such determination. If the motion for a new trial is granted conditionally, the order thereon does not affect the finality of the judgment. If the motion for a new trial has been granted conditionally and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered. If such motion has been denied conditionally, the appellee on appeal may assert error in that denial, and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.

Rule 29 motion as to Count Three." Asked by the prosecutor to explain its ruling, the Court replied:

> Well, yes, because as to Count One and Count Two, this defendant has been found not guilty. The evidence that is before the Court, which would support a finding of guilty as to Count 3, would likewise be necessary for findings of guilt on Count One and Two. I, therefore, determine that the Government has failed to prove beyond a reasonable doubt this man's guilt on Count 3. I therefore, enter the verdict under Rule 29. As you know at this juncture, the Government has the right to appeal even after the mistrial. So, that is the ruling of the Court at this time.

On December 20, 1993, the district court issued an order explaining its judgment. It stated:

> The uncontradicted evidence, when viewed in the light most favorable to the government, shows that the defendant, Willie Mackins, removed and stored some of the personal belongings of Robert Mack, the defendant's brother-in-law and an individual incarcerated for dealing drugs, from Mr. Mack's apartment. The defendant removed Mr. Mack's belongings at the request of Mr. Mack, and took them to the defendant's residence. The defendant stored an ammo box containing the contraband in the defendant's garage off the ground. The defendant stored Mr. Mack's other belongings in an adjacent storage shed, which, unlike the garage, was waterproof.
>
> The uncontradicted evidence, when viewed in the light most favorable to the government, also shows that the quantity of contraband found exceeded personal use quantities. However, there is no evidence that the defendant made any attempt to negotiate the sale or transfer of the contraband, which he was storing for a protracted period of time.
>
> Further evidence which could have been considered by the jury on all three counts of the indictment would probably not be admissible in a trial solely on count three, a possession with intent to distribute charge, since the defendant was already

found not guilty on the conspiracy count by the jury.

> In summation, when considering the admissible evidence in a light most favorable to the government, on the sole issue of count three, no rational finder of fact could find the defendant guilty of possession with intent to distribute, as charged in count three of the bill of indictment.

## II

18 U.S.C. § 3731 authorizes the government to appeal from a district court's order dismissing an indictment "except that no appeal shall lie where the double jeopardy clause ... prohibits further prosecution." The Double Jeopardy Clause prevents a retrial after an acquittal, and it prevents an appeal from a judgment of acquittal if a successful appeal would require further factual proceedings against the defendant. *See, e.g., Smalis v. Pennsylvania*, 476 U.S. 140, 106 S.Ct. 1745, 90 L.Ed.2d 116 (1986); *United States v. Martin Linen Supply Company*, 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977). An acquittal represents a judgment by a jury or a court that the evidence is insufficient to convict. *United States v. Scott*, 437 U.S. 82, 91, 98 S.Ct. 2187, 2194, 57 L.Ed.2d 65 (1978). A defendant is acquitted when:

> the ruling of the judge, whatever its label, actually represents a resolution [in the defendant's favor], correct or not, of some or all of the factual elements of the offense charged. Where the court, before the jury returns a verdict, enters a judgment of acquittal pursuant to Fed. Rule Crim.Proc. 29, appeal will be barred only when "it is plain that the district court ... evaluated the government's evidence and determined that it was legally insufficient to sustain a conviction."

*Id.* at 97, 98 S.Ct. at 2197 (quoting *Martin Linen Supply*, 430 U.S. at 571–72, 97 S.Ct. at 1354–55) (footnote omitted).

If the district court issues a judgment of acquittal and the record demonstrates that the court has actually found that the government's evidence was insufficient to convict, the judgment constitutes an acquittal under

the Double Jeopardy Clause which bars a government appeal and a retrial. *See e.g., Smalis,* 476 U.S. at 141–42, 106 S.Ct. at 1746–47 (trial court stated that it "was not satisfied after considering all of the facts together with all reasonable inferences ... that there was sufficient evidence from which it could be concluded that ... the defendants were guilty beyond a reasonable doubt"); *Martin Linen Supply,* 430 U.S. at 572, 97 S.Ct. at 1355 (district court stated that the prosecution was "the weakest [contempt case] that I've ever seen," and that the government failed to prove the charge beyond a reasonable doubt); *Fong Foo v. United States,* 369 U.S. 141, 142, 82 S.Ct. 671, 671–72, 7 L.Ed.2d 629 (1962) (district court determined, among other things, that the testimony of the government's witnesses was incredible).

■ On the other hand, if a district court issues without precision what it labels as a judgment of acquittal, but the record, as here, shows that the judgment is based on other than the issue of insufficiency of the evidence, the judgment constitutes a dismissal of the indictment, not an acquittal, and the government may appeal from that order under 18 U.S.C. § 3731. *See, e.g., United States v. Council,* 973 F.2d 251, 253–54 (4th Cir.1992) (judgment of acquittal based on government's violation of district court's discovery orders permits retrial).

■ When the district court reviews the sufficiency of the evidence on a charge, it should compare the government's evidence against the elements of the charged offense, but it should not consider the jury's verdict that the evidence was insufficient on another charge. *United States v. Powell,* 469 U.S. 57, 67, 105 S.Ct. 471, 478, 83 L.Ed.2d 461 (1984).

Further, the Supreme Court has held that sufficiency of the evidence review requires the district court to consider *all* of the evidence admitted at trial. In *Lockhart v. Nelson,* 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d

265 (1988), the Supreme Court held that retrial is not barred where

> a reviewing court determines that a defendant's conviction must be reversed because evidence was erroneously admitted against him, and concludes that without the inadmissible evidence there was insufficient evidence to support a conviction.

*Id.* at 40, 109 S.Ct. at 290.

■ In the instant case, the entire dispute rests on alternative interpretations of the district court's ruling. The government argues that the district court's order barring a retrial on Count 3 was not an acquittal for purposes of the Double Jeopardy Clause because the district court did not find that the evidence admitted was insufficient. In support of that theory, the government points to the two prior denials of the Rule 29 motions, during one of which the district court specifically stated that the evidence "would support a finding of guilt on Count 3." The government contends that the district court "exclusive[ly] reli[ed] on the jury's acquittals on the other drug counts" in determining whether the evidence was sufficient to convict under Count 3.

In its Order, the district court ruled that the "admissible evidence" was not sufficient to convict, and that the evidence of conspiracy, which "could have been considered by the jury" would "probably not be admissible" at a retrial solely on Count 3 because of appellee's acquittal on the conspiracy count.

The government contends that the district court violated the holding of *Lockhart,* in not basing its decision on all actually introduced evidence—both the evidence pertaining to Count 3 and the evidence pertaining to the other counts, whether or not it would "probably" be inadmissible. Understood that way, the district court's ruling was actually a finding of potential trial error (i.e. the finding that at a future trial evidence would be admitted that would probably not be admissible), not a finding of insufficiency of the evidence.[2]

---

1182, 1187 (4th Cir.1993). The conspiracy Count 1 may have resulted from the jury's doubt as to whether an agreement of conspirators had been proved. Count 3, on the other hand, charged an offense by the defendant alone; it

required no proof of an agreement by conspirators, the existence of any not being relevant. The attempt to distribute (Count 2) concerned different drugs on a different day than Count 3.